UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| PENTECOSTAL CHURCH OF GOD, a California entity, d/b/a GREAT LIFE CHURCH, and PASTOR LARRY SPIVEY, | Case No. 3:16-cv-00400-LRH-WGC |
| | ORDER |
| Petitioners/Plaintiffs, | |
| v. | |
| DOUGLAS COUNTY AND ITS BOARD OF COUNTY COMMISSIONERS, | |
| Respondents/Defendants. | |

This matter comes before the court on Pentecostal Church of God d/b/a Great Life Church and Pastor Larry Spivey's (collectively, "Petitioners") petition for judicial review of the denial of a special use permit application. ECF No. 27. Douglas County and the Board of Commissioners' (collectively, "Respondents") filed an opposing brief, and Petitioners replied. ECF Nos. 28, 31. The court has fully considered the parties' briefs as well as their oral arguments on March 19, 2018. ECF No. 35. The court has now completed its judicial review of the denial of the special use permit by Respondents and affirms the Respondents' decision denying the permit.

**I.   BACKGROUND**

This matter arises from the denial of a special use-permit application. *See* ECF No. 1. The Church applied for the permit, seeking to build a church at 990 Riverview Drive in Douglas

County, Nevada. AR[1] 3. The Church required a special use permit because the property sits in a SFR-1 zone.[2] AR 3, 18. The property is located in the Gardnerville Ranchos community plan and is surrounded by four existing streets. AR 3, 223.

Two public hearings were held regarding the application and the related project. First, the Douglas County Planning Commission ("the Planning Commission") held a public hearing in March 2016. *See* AR 53, 57. Then, the Douglas County Board of Commissioners ("the Board") held a public hearing in May 2016. AR 73. The court summarizes the testimony and the evidence presented at each hearing in turn.

**A. March 2016 Hearing Before the Planning Commission**

At the March 2016 hearing, the Planning Commission staff recommended approving the Church's application based on staff members' findings that the project satisfied the relevant Douglas County Codes ("DCC").[3] AR 5, 11–15. But the Planning Commission staff recommended approving the project only if certain conditions were imposed, including limiting lighting to ensure compatibility with the "dark sky" neighborhood and prohibiting on-street

---

[1] "AR" refers to the administrative record for this matter.
[2] A SFR-1 Zone is designated for single family residential properties with a minimum of one-acre parcel size.
[3] DCC § 20.604.060 requires a finding of the following eight factors:
A. The proposed use at the specified location is consistent with the policies embodied in the adopted master plan and the general purpose and intent of the applicable district regulations;
B. The proposed use is compatible with and preserves the character and integrity of adjacent development and neighborhoods and includes improvements or modifications either on-site or within the public rights-of-way to mitigate development related adverse impacts, such as traffic, noise, odors, visual nuisances, or other similar adverse effects to adjacent development and neighborhoods. These improvements or modifications may include, but shall not be limited to the placement or orientation of buildings and entryways, parking areas, buffer yards, and the addition of landscaping, walls, or both, to mitigate such impacts;
C. The proposed use will not generate pedestrian or vehicular traffic which will be hazardous or conflict with the existing and anticipated traffic in the neighborhood;
D. The proposed use incorporates roadway improvements, traffic control devices or mechanisms, or access restrictions to control traffic flow or divert traffic as needed to reduce or eliminate development impacts on surrounding neighborhood streets;
E. The proposed use incorporates features to minimize adverse effects, including visual impacts and noise, of the proposed special use on adjacent properties;
F. The project is not located within an identified archeological or cultural study area, as recognized by the county. If the project is located in a study area, an archeological resource reconnaissance has been performed on the site by a qualified archeologist and any identified resources have been avoided or mitigated to the extent possible per the findings in the report;
G. The proposed special use complies with all additional standards imposed on it by the particular provisions of this chapter and all other requirements of this title applicable to the proposed special use and uses within the applicable base zoning district, including but not limited to, the adequate public facility policies of this title; and
H. The proposed special use will not be materially detrimental to the public health, safety, convenience and welfare, and will not result in material damage or prejudice to other property in the vicinity.

parking. AR 57. Hope Sullivan, a Planning Commission staff member, explained the project. AR 57–58. She stated, in part, that any increased traffic would not negatively impact the neighborhood. AR 57.

Keith Shaffer testified after Sullivan. AR 57. Shaffer, a senior project manager with Manhard Consulting, assisted the Church in preparing its application. *See* AR 16–17. At the March 2016 hearing, he explained the traffic impact would be minimal, meaning a detailed traffic study was not required.[4] AR 57. He also testified that the Church was willing to comply with the conditions suggested by the Planning Commission. *Id.*

Pastor Spivey testified after Shaffer and agreed that any increase in traffic would be minimal. AR 58. He also stated that he had no intentions to expand the building in the future even though he anticipated the congregation would grow. *Id.* Pastor Spivey testified that he was willing to accept the conditions suggested by the Planning Commission. *Id.* He also agreed that the Church would not hold late-night services if necessary to comply with the conditions. *Id.*

The Planning Commission then opened the hearing for public comment. *Id.* Charlie Fecteau and Mary Ellen Padgett testified in opposition to the project, stating on-street parking would negatively impact their businesses. AR 59. Janine Hamilton also opposed the project, stating it conflicted with the master plan of the community which prioritizes the development of land for community purposes. *Id.* She stated that the project violated a master plan policy, which serves "to protect the residential neighborhoods from encroachment." *Id.* The remaining three public commenters—Heather Bodily, Jim Slade, and Christine Hendrickson—voiced their concern over increased traffic. *Id.*

After the Planning Commission closed public commenting, Sullivan spoke on behalf of the Planning Commission staff again. *Id.* She explained that a traffic study was not required because less than 80 peak-hour trips and less than 500 daily trips were projected as a result of the project. *Id.* She also discussed the project design, stating that a ten-foot-wide buffer would be placed on at least three sides of the property. AR 60. And she testified that the building would be

---

[4] Shaffer testified he determined the traffic would be minimal under the guidelines of the Institute of Transportation Technologies. AR at 57.

limited to church activities. *Id.* After Sullivan's testimony, Shaffer offered to conduct a detailed traffic study and to place "No Parking" signs on the street. *Id.* He also opined that the project's landscaping would improve the property. *Id.*

Commissioner Frank Godecke and Commissioner James Beattie moved to grant the Church a special use permit but the motion failed. *Id.* Commissioner Bryan Davis and Commissioner James Madsen then moved to deny the Church's application for failure to meet two criteria under DCC § 20.604.060: (1) the project would not be "compatible with and preserve[] the character and integrity of adjacent development and neighborhoods" despite the "improvements or modifications [that would] mitigate development related adverse impacts[,]" DCC § 20.604.060(B); and (2) the project would "generate pedestrian or vehicular traffic which will be hazardous or conflict with the existing and anticipated traffic in the neighborhood," DCC § 20.604.060(C). *Id.* The motion carried, resulting in the denial of the Church's application. *Id.* The Church appealed the Planning Commission's decision to the Board. *See* AR 65, 72.

### B. May 2016 Hearing Before the Board

The Board held a public hearing in May 2016. AR 73. In addition to the testimony and the evidence obtained during the March 2016 hearing, the Board was provided with petitions in favor of the project, petitions in opposition to the project, public correspondence received after the March 2016 hearing, and a complete traffic study conducted after the March 2016 hearing. AR 73, 168–94, 223. The public correspondence included: (1) an email from Tom and Judy Doherty, opposing the project based on concerns regarding traffic and the nature of the neighborhood, AR 170; (2) an email from Christine Mills, opposing the project based on traffic concerns, AR 118; and (3) an email from Christine Hendrickson, also opposing the project based on the existing traffic and the increase in traffic that would result from the project, AR 120. The authors of the emails all lived near the at-issue property. AR 170, 118, 120.

Mimi Moss, the Community Development Director, spoke first. AR 216, 223–28. Moss began by describing the location and the design of the project. AR 223–24. She stated that the Gardnerville Ranchos General Improvement District did not recommend approval of the project.

4

AR 224. She also stated that seventy-six residents demonstrated opposition to the project by signing a petition. AR 224. But 250 people signed a petition in favor of the project. AR 225.

Moss summarized the concerns with the project as the following: (1) increased traffic; (2) additional noise and lighting problems; (3) issues resulting from on-street parking; (4) a decrease in property values; and (5) negative impacts on views from existing properties. AR 224–25.

Moss then addressed different aspects of the project. AR 225. She first explained the traffic study, which found that 183 daily trips would occur on average on Sundays and that 46 daily trips would occur on average during weekdays. AR 225. She then described the planned landscaping, which would provide a buffer to the parking lots and would decrease the noise and visual impacts to the area. AR 225. She also stated that the parking lot would contain 65 parking spaces, which met the code requirements for a church and prevented the need for on-street parking. AR 225–26. She explained that a photometric survey for lighting would be required and would ensure that the project did not create lighting issues. AR 226. And she finally described the design as one with "residential character." AR 226.

After summarizing the information contained in the appeal, Moss detailed the Planning Commission staff's earlier recommendation to grant the permit, the Planning Commission's reasons for denying the permit, and the Planning Commission staff's current recommendation to uphold the Planning Commission's decision to deny the permit. AR 227–28.

After Moss finished, Commissioner Steve Thayler explained that the particular location of the project caused him concern, citing to the "very[,] very busy intersection" and the increase in traffic. AR 231 (emphasizing his "big concern is traffic" and "not … the church" itself). And although the Board had not finished hearing testimony, he concluded then that the Planning Commission correctly determined the project would fail to preserve the character of the neighborhood and would result in increased traffic that would negatively impact the neighborhood. AR 231–32.

Shaffer testified next. AR 232. He first addressed the project's impact on the character and integrity of the neighborhood. AR 232–37. He stated that the property would be difficult to build upon due to being bounded by four streets and requiring a substantial investment. AR 232–

5

34. But the Church could improve the property through the proposed project, which would result in the property being more consistent with the neighborhood than it was at the time of the hearing based on the residential-nature of the project's design. AR 232–34. Shaffer also stated that the parking lot would give the Church sixty-five parking spaces—fifty more than what the Church currently used. AR 234. Accordingly, on-street parking would not be needed. AR 234. Shaffer also highlighted that the building would not be the first church in the neighborhood— seven other churches existed in a two-mile radius from the property. AR 237.

Shaffer then turned to the traffic issue. AR 237–41. He explained that a complete traffic study was not required for the project. AR 239. But after the Planning Commission denied the Church a permit, a full traffic study was completed. AR 240. The study concluded that the project would result in a level A or level B service[5] and would result in a 0.6 second delay to the current time a person waits at the nearby intersection. AR 240. Shaffer also stated that signage and road markings would help prevent on-street parking and negative traffic impact. AR 241.

After Shaffer finished his presentation, Commissioner Nancy McDermid asked Moss if the Planning Commission's concerns had been addressed. AR 242. Moss answered in the affirmative. *Id.*

Commissioner Thayler again renewed his concerns over traffic and voiced his concerns that on-street parking would occur despite the suggested conditions to prevent it. AR 244–46.

Commissioner Greg Lynn spoke next. AR 246. Commissioner Lynn explained that the people opposing the project by way of the petition lived near the property. AR 247. But the people supporting the project by way of petition did not. AR 247. He also questioned whether the parking lot would suffice in the future. AR 247. Commissioner Lynn emphasized he was primarily concerned with neighborhood compatibility. AR 248. He worried that placing a church on the property would alter the nature of the community and negatively affect the investments of existing homeowners. AR 248.

---

[5] The levels of service range from A to F, with A being the best and F being the worst. AR 240. The levels correspond to the number of seconds a person must wait at an intersection before making a movement. *Id.*

6

Commissioner McDermid spoke after Commissioner Lynn. AR 248. She had no concerns over the neighborhood compatibility—emphasizing that the Planning Commission's concerns had been "adequately addressed" during the hearing. AR 248–50.

In response to the Commissioner's comments, Sheffer requested the Board to allow the traffic engineer to speak about the results of the traffic study. AR 250. But Sheffer's request was denied, and the Board instead opened the hearing to public comment. AR 250–52.

During the public-comment section of the hearing, Leslie Burns, David Burns, Christopher Lee King, Karen King, Susan Berger, George Berger, Mary Lent, and Rob Anderson supported the project. AR 252–54, 259–62, 267–77, AR 279–80, AR 282–84. Many of those in support of the project were members of the Church. AR 252, 259, 272–77, 279. Janine Hamilton, Eric Warren, Tony Fleckdale, Robert Cook, Joanna Awana, Loraine Cooke, and Caleb Worth opposed the project, citing concerns over the impact on traffic or the impact on the nature of the community. AR 255–59, AR 262–63, AR 265–67, AR 278–79, AR 285, AR 286–87. Brad Bennett neither opposed nor supported the project explicitly. AR 277. He instead lamented over the current traffic and the dangerous nature of the intersection. AR 277–78.

Pastor Spivey voiced his support for the project during public comments. AR 285. Paul Saladey—the engineer who conducted the traffic study—also supported the project during public comments. AR 280–82. He first explained how he conducted the study and then opined that the property had the capacity to serve as a church. AR 280–82.

After closing the hearing to public comments, the Commissioners discussed the inevitable need to address the intersection, assured the project would not impact the dark-sky nature of the neighborhood, and clarified the type of landscaping that would be used. AR 287–90. Commissioner Thayler then reiterated his concern regarding the traffic impact, which he relied in part on personal experiences with the intersection and surrounding roads. AR 290–93. Commissioner Barry Penzel then voiced his concern over the traffic impact but stated the Church would be compatible with the neighborhood. AR 293–96. Commissioner Doug Johnson spoke last, stating the Church's presentation led him to believe traffic would not be an issue. AR 298.

But regardless, Commissioner Johnson supported the Planning Commission's decision based on the project's incompatibility with the neighborhood. AR 299.

Commissioner Thayler and Commissioner Lynn moved to uphold denial of the permit application. AR 299–300. The motion carried, and the Church's appeal was denied. AR 301–03. The Church now petitions this court for judicial review of the Board's decision pursuant to NRS 233B.135. ECF No. 27.

NRS 233B.135 provides for the judicial review of a final decision from an administrative agency. Nev. Rev. Stat. § 233B.135(1). The review must be conducted by a court without a jury and must be confined to the administrative record. *Id.* And while the court may not reweigh the evidence, it may set aside an agency decision under certain circumstances including if the decision: (1) violates constitutional provisions; (2) is clearly erroneous in view of reliable, probative, and substantial evidence; or (3) is arbitrary, capricious, or an abuse of discretion. Nev. Rev. Stat. § 233B.135(2)–(3).

## II. DISCUSSION

The Church argues for the reversal of the Board's decision on four grounds: (1) no substantial evidence supports the denial of the Church's application; (2) the denial results in a violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"); (3) the denial results in a violation of equal protection; and (4) the denial results in a violation of due process. The court considers each ground in turn.

### A. Substantial Evidence

The court first turns to the Church's argument that no substantial evidence supports the Board's decision. Under Nevada law, a court reviews an administrative decision for abuse of discretion. *Stratosphere Gaming Corp. v. Las Vegas*, 96 P.3d 756, 760 (Nev. 2004). The court must not substitute its judgment for that of the administrative agency. *City of Reno v. Citizens for Cold Springs*, 236 P.3d 10, 15–16 (Nev. 2010). The court therefore may not reweigh the evidence. *See id; see also Transportation Servs. Auth. of Nevada v. Garijo*, 281 P.3d 1225 (Nev. 2009). Further, the court's review is limited to the administrative record. *City of Las Vegas v. Laughlin*, 893 P.2d 383, 384 (Nev. 1995).

A discretionary decision includes the grant or the denial of an application for a special use permit. *City Council of Reno v. Travelers Hotel*, 683 P.2d 960, 961 – 62 (Nev. 1984). If substantial evidence supports a discretionary decision, "there is no abuse of discretion." *Laughlin* 893 P.2d at 384. "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citations omitted). Public testimony may constitute substantial evidence that a public agency may rely upon to deny an application for a special use permit. *Redrock Valley Ranch, LLC v. Washoe Cnty.*, 254 P.3d 641, 648 (Nev. 2011).

The public testimony that opposed the project constitutes substantial evidence on which the Board properly relied when denying the Church a special use permit. The Board denied the Church a permit, citing the project's failure to meet two considerations under DCC § 20.604.060: (1) the required compatibility with the character and integrity of the neighborhood despite mitigating project modifications and (2) the resulting traffic impact would not be hazardous or conflicting with the existing traffic. The Board made its decision based, in part, on public testimony, which supported the Board's decision. The public testimony demonstrated concerns over the project's impact on traffic at the particular intersection immediately adjacent to the property; public comments included personal experience with what was repeatedly described as an already dangerous, busy intersection. The public testimony also demonstrated concerns over the project's impact on the nature of the particular neighborhood in which the property sits; public comments described the negative impacts on business, residential values, and the quiet-nature of the community. Further, as Commissioner Lynn highlighted, many of the people opposing the project were residents of the neighborhood. They were therefore familiar with the area by way of personal experience. While the Board was also presented with evidence favoring the granting of the permit, the court must not reweigh the evidence. The court therefore affirms the Board's decision, finding the public testimony from residents of the community constitutes substantial evidence that supports the Board's decision.

///

///

**B. RLUIPA**

The court now turns to the Church's argument that the Board's decision violates RLUIPA. RLUIPA prohibits a government entity from imposing a substantial burden on a person, an assembly, or an institution's religious exercise by way of a land-use regulation unless imposing the substantial burden meets two criteria: (1) it furthers a compelling government interest and (2) it is the least restrictive means. 42 U.S.C. § 2000cc(a)(1). RLUIPA applies when the government entity uses formal or informal procedures resulting in "individualized assessments of the proposed uses for the property involved." *Id.* § 2000cc(a)(2)(C).

Under RLUIPA, the plaintiff must first demonstrate the government entity substantially burdened the plaintiff's religious exercise. *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1067 (9th Cir. 2011). RLUIPA defines broadly religious activity; religious activity includes "any exercise or religion, whether or not compelled by, or central to, a system of religious belief" as well as "[t]he use, building, or conversion of real property for the purpose of religious exercise…." 42 U.S.C. § 2000cc-5. But RLUIPA does not define substantial burden. *See id.* In the context of land-use regulation, the Ninth Circuit requires a burden to "be oppressive to a significantly great extent" to constitute a substantial burden. *Guru Nanak Sikh Soc. of Yuba City v. Cty. of Sutter*, 456 F.3d 978, 988–89 (9th Cir. 2006) (internal citations omitted). The burden "must impose a significantly great restriction or onus" on religious exercise. *Id.* (internal citations omitted). The burden "must place more than inconvenience on religious exercise." *Foursquare Gospel*, 673 F.3d at 1067. But the burden need not be insurmountable. *Id.* at 1068. "[W]hen the religious institution has no ready alternatives, or where the alternatives require substantial delay, uncertainty, and expense, a complete denial of the religious institution's application might be indicative of a substantial burden." *Id.* [internal citations and punctuation omitted].

If the plaintiff meets the initial burden under RLUIPA, the burden shifts to the government. *Int'l Church of Foursquare Gospel*, 673 F.3d at 1067. The government must prove that its conduct furthers a compelling government interest in the least restrictive means. *Id.*; *see also* 42 U.S.C. § 2000cc(a)(1)(A)–(B).

The parties do not dispute the applicability of RLUIPA to this matter. Accordingly, the court first considers whether Petitioners demonstrated a substantial burden on their religious activity.

*1. Substantial Burden on Religious Activity*

Petitioners argue that the denial of the special use permit resulted in a substantial burden on their religious exercise because it prevents Petitioners from using their property in a manner that is "compatible [with the county code] when necessary steps are taken and conditions [are] imposed to mitigate any legitimate adverse effects…" ECF No. 27 at 19. The court disagrees.

Petitioners fail to demonstrate a substantial burden. The record demonstrates that in denying the Church's application for a special use permit the Board found the property to be inappropriate for the proposed use based on substantial evidence of negative impacts on traffic and on the nature of the neighborhood. The decision focused on the particular location of the property—its nexus to a particular intersection and its location in a particular neighborhood. The evidence does not suggest that other sites would be unsuitable; the record does not indicate that the Church would be denied a permit to build on a property that was not located near the at-issue intersection; and nothing in the record suggests that the permit was denied based on the proposed use of the land for religious purposes. *See Mesquite Grove Chapel v. DeBonis*, 633 F. App'x 906, 908 (9th Cir. 2015) ("The primary burdens presented here—relocating or submitting a modified application—were not substantial, especially because [the petitioner] presented no evidence that other sites were unsuitable … [and] the Inspector's decision was not arbitrary or made in bad faith."); *see also San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1035 (9th Cir. 2004) ("[T]here is no evidence in the record demonstrating that College was precluded from using other sites within the city. Nor is there any evidence that the City would not impose the same requirements on any other entity seeking to build something other than [the intended buildings under the zoning ordinance] on the property."). Because the Board's decision focused on the particular property, intersection, traffic, and neighborhood and prevents the project from occurring only at the particular property, the court finds that the burden imposed

upon Petitioners does not rise to the level of a substantial burden upon Petitioners' religious exercise as prohibited by RLUIPA.

Petitioners rely heavily on two Ninth Circuit decisions when attempting to demonstrate a substantial burden: *International Church of Foursquare Gospel v. City of San Leadro*, 673 F.3d 1059 (9th Cir. 2011), and *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 450 F.3d 978 (9th Cir. 2006). Neither case persuades the court to find for Petitioners.

In *Foursquare Gospel*, the religious institution signed a purchase and sale agreement for a property in the industrial park zone. 673 F.3d at 1061–62. To use the property as a church, the city instructed that the institution needed to secure two amendments: (1) an amendment in the zoning code to make assembly a conditionally permitted use in industrial limited zones and (2) an amendment to the zoning map to designate the property as industrial limited. *Id.* at 1062. The institution applied for the amendments based on the city's instructions. *Id.* But after approximately one year of deliberation and public hearings—and after the institution paid a $50,000 nonrefundable fee and closed escrow on the property—the city denied the institution's application to include the property in the industrial-limited zone. *Id.* at 1063–65. The institution sued. *Id.* at 1065. At the summary judgment phase, the institution offered evidence that "no other suitable sites exist in the City to house the Church's expanded operations." *Id.* at 1067. The institution's realtor concluded no other properties would suit the project based on the examination of 196 properties zoned for assembly use. *Id.* at 1068. Based on this evidence, the Ninth Circuit held that a triable issue of fact existed and reversed the district court's award of summary judgment in favor of the city. *Id.* at 1070.

The *Foursquare* decision does not affect the court's judgment here. First, this matter does not involve comparable time delays or expenses to that in *Foursquare*. Rather than a year-long process, the Board denied the Church's application within three months. The record is also void of any significant financial losses such as the loss of the $50,000 non-refundable payment made in *Foursquare* in reliance on the city's instructions. And here, unlike the *Foursquare* plaintiffs, the Church has presented no evidence that other properties in Douglas County are unavailable or unsuitable for its project. Additionally, this matter does not come before the court on a motion

12

for summary judgment. Here the plaintiffs' petition is for judicial review of the final decision of the Board. The court has considered the evidence before the Board and has found (1) that there is substantial evidence which supports the Board's decision, (2) that a substantial burden on the Petitioners' religious exercise has not been shown, and (3) that no religious discrimination occurred. The facts and history before the court fall far short of those found in *Foursquare*.

*Guru Nanak* also does not affect the court's decision. In *Guru Nanak*, the religious institution was first denied a conditional use permit for a property located in a residential zone based on citizens' fears of noise and traffic impacts on the existing neighborhood. 456 F.3d at 982. To avoid concerns over traffic and noise impacts, the institution purchased a piece of land in an agricultural zone that was located away from high-density neighborhoods. *Id.* at 982–83. But the county denied the permit again, citing concerns over leapfrog development; the property was located too far from the city. *Id.* at 983–84. The Ninth Circuit stated that it "[could not] view the denial of the second [conditional use permit] in isolation, rather it must be viewed in the context of [the religious institution's] permit process history." *Id.* at 991 (internal quotations and punctuation marks omitted). In viewing the two denials together, the Ninth Circuit held that "[t]he net effect of the County's two denials … is to shrink the large amount of land theoretically available to the [religious institution] under the Zoning Code to several scattered parcels that the County may or may not ultimately approve." *Id.* at 991–92. The denials therefore amounted to a substantial burden on the institution's religious exercise because "the reasons for denying [the two applications] to a significantly great extent lessened the possibility that future [conditional use permits] would be successful." *Id.* at 989. The "County could use its concern with leapfrog development effectively to deny churches access to all [properties located farther away from the city]." *Id.* at 990.

The concerns in *Guru Nanak* are not present here. The Board did not cite general concerns, *e.g.* leapfrog development. The Board instead denied the permit based on substantial evidence of reasons specifically applicable to the particular property. The Board found the property unsuitable based on its proximity to an already busy, and possibly dangerous, intersection as well as its location in a particular neighborhood. Consequently, the denial did not

limit the Church's opportunity or ability to seek out other available properties and did not suggest an application related to a more suitable property would be denied. Further, the Church's permit-process history shows the Board previously approved a requested variance for the Church at another location in the area. The approval indicates the Board would not rely on the reasons for the at-issue denial to deny the Church access to other properties suitable for the project. As a result, *Guru Nanak* does not impact the court's decision.

Because the court finds Petitioners failed to demonstrate a substantial burden on the institution's religious exercise, the court does not reach the question of whether the Board's actions furthered a compelling state interest in the least restrictive means. The court denies the RUILPA claim based on Petitioners' failure to demonstrate a substantial burden on their religious exercise.

**C. Equal Protection**

The court now considers Petitioners' argument that the Board's decision denied the Church equal protection guaranteed under the Constitution. Petitioners assert a class-of-one theory, arguing the Board intentionally, and without a rational basis, treated the Church different than the other religious institutions that obtained permission to build churches nearby the at-issue property. ECF No. 27 at 20–23. The court again disagrees.

To bring a successful claim-of-one challenge under the Equal Protection Clause, a plaintiff must show a government entity intentionally treated the plaintiff differently from others similarly situated without a rational basis justifying the differential treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Despite the existence of several other churches within the area, the administrative record does not indicate that the existing churches sit at the same intersection—or even a similar intersection—as the at-issue property. The traffic concerns regarding the busy intersection instead appear unique to the property on which the Church sought to construct its building. The court therefore denies the equal protection claim.

**D. Due Process**

The court finally considers Petitioners' claim that the Board violated Petitioners' Constitutional due process rights because the Board's "arbitrary and irrational denial of [the]

special use permit, effectively denying [the Church] the protections of RLUIPA[.]" ECF No. 31 at 19. But as described above, RLUIPA was not violated by the Board's decision. The Board's decision was also not arbitrary or irrational; it was based on substantial evidence of the project's impact on traffic and its impact on the nature of the particular neighborhood. Petitioners' basis for their due process claim fails as a result.

### III.　CONCLUSION

In conclusion, the court has conducted its judicial review of the final decision of the Douglas County Board of Commissioners' denial of the special use permit application sought by Plaintiffs and concludes that it is compliant with all constitutional and statutory provisions based upon substantial evidence presented to the Board. The Board's denial should be, and hereby is, AFFIRMED.

Petitioners' challenges under RLUIPA, and upon grounds of equal protection and due process, are DENIED.

IT IS SO ORDERED.

DATED this 2nd day of April, 2018.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE